# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 11-216V
Filed: December 11, 2018
Not to be Published

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| JEFFREY DAVID SIMMONS, | * | |
| | * | |
| Petitioner, | * | Petitioner's Motion for a Ruling on Damages Award |
| | * | |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Clifford J. Shoemaker, Vienna, VA, for petitioner.
Justine E. Walters, Washington, DC, for respondent.

**MILLMAN, Special Master**

## RULING ON DAMAGES AWARD[1]

On April 7, 2011, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that the tetanus toxoid-diphtheria-acellular pertussis ("Tdap") vaccine he received on April 11, 2008 caused him anaphylaxis, immune dysregulation, and autoimmune disease leading to Addison's disease.   Pet. at ¶ 107.   Petitioner was 38 years old when he received Tdap vaccine.   He is now 49 years old.

On October 30, 2015, the undersigned ruled that petitioner is entitled to compensation, holding ". . . it is reasonable to connect petitioner's entire immunologic reaction to his adverse response [to the Tdap vaccine]. . . . [P]etitioners do not have the burden of proving a specific

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

biological mechanism." <u>Simmons v. Sec'y of HHS</u>, No. 11-216V, 2015 WL 6778563, at *8 (Fed. Cl. Spec. Mstr. Oct. 30, 2015).   Since then, the parties have been engaged in resolution of damages.

One barrier to settlement is the calculation of petitioner's lost wages.   On July 19, 2016, petitioner's economist Dr. Robert W. Cook submitted his first expert report stating petitioner's net lost income is $4,950,921.00.   Doc 113-2.

On May 23, 2017, respondent filed his first expert report from his economist Dr. Patrick F. Kennedy stating petitioner has $1,017,816.00 in loss of earnings and benefits.   Doc 143-1. During a status conference held on June 5, 2017, the undersigned gave petitioner until June 30, 2017 to file Dr. Cook's responsive report.

On September 20, 2017, petitioner filed the first affidavit of Mr. Jeff Barrom, a Senior Vice President with Hub International Northwest, LLC ("HUB International").   Doc 148-2.

On October 30, 2017, after three motions for an extension of time, petitioner filed Dr. Cook's supplemental (second) expert report based on information provided in Mr. Barrom's first affidavit, concluding petitioner has $3,978,303.00 in net lost income.   Doc 150-2.

During a status conference held on November 17, 2017, the undersigned discussed the parties' expert reports (Docs 113-2, 143-1, and 150-2) and Mr. Barrom's affidavit (Doc 148-2). On November 20, 2017, the undersigned issued an order addressing several issues in the parties' economic expert reports, and requiring Mr. Barrom to answer respondent's additional questions and each party to file their supplemental economist reports.   Doc 151.   In the same Order, the undersigned required the parties' experts, in their supplemental expert reports, to use: (1) the same date, January 1, 2018, as the demarcation between petitioner's past and future damages, subject to future changes; (2) the same lengths of life expectancy (March 8, 2049) and work life expectancy (May 28, 2033); (3) $42,070.00 as the base W-2 income in 2009 to calculate petitioner's incomes from 2010 to at least March 31, 2014; and (4) Employment and Earnings for Insurance Agencies and Brokerages ("EEIAB") as the source for projections of petitioner's wage growth since the data are specific to the insurance industry.   <u>Id.</u> at 2-3.

On January 25, 2018, petitioner filed Mr. Barrom's second affidavit, in which Mr. Barrom said he cannot provide copies of the material upon which he relied because the material is "confidential and proprietary."   Doc 153-2, at 1.

On April 10, 2018, petitioner filed Dr. Cook's supplemental (third) expert report providing petitioner's lost wages as "no less than $2,619,329.00 and no more than $3,698,921.00."   Doc 159-2, at 9.   On April 16, 2018, respondent filed Dr. Kennedy's supplemental (second) expert report in response to the undersigned's Order of November 20, 2017 and to Mr. Barrom's second affidavit.   Doc 160-1.

In an email on April 27, 2018 to the undersigned's law clerk, respondent stated if petitioner intended to continue to rely on Mr. Barrom's affidavits, he should produce the material upon which Mr. Barrom relied in his statements supporting petitioner's loss of earnings.   On April 27, 2018, petitioner filed a status report asserting that the record on lost wages was complete and Mr. Barrom would not be able to provide copies of documentation upon which he relied in his affidavits due to confidentiality and proprietary issues.   Doc 161, at 1.

On April 30, 2018, the undersigned issued an order requiring respondent to file a Motion for Discovery of the material upon which Mr. Barrom relied in his affidavits.   On May 21, 2018, respondent filed a Motion for Production of Documents Regarding Petitioner's Lost Wages Claim ("Motion for Production").

On May 22, 2018, petitioner filed a Notice of Clarification and Partial Response to Motion to Produce Documents stating that because petitioner is not in possession of the documents and has no ownership of the documents, respondent should be seeking Third Party Discovery as neither Mr. Barrom nor HUB International is a party in this case.   Doc 165, at 1.

On June 5, 2018, respondent filed a response to Petitioner's Notice of Clarification and Response to Motion to Produce Documents stating that it is petitioner's burden to prove petitioner's damages and "a special master cannot award over $1 million in additional lost wages based on a third party's interpretation of undisclosed evidence that neither party nor the Court has seen."   Doc 167, at 2.

On the same day, the undersigned ordered each party to select by June 19, 2018 one of three options: (1) the undersigned will hold a hearing on economic loss with Dr. Cook, Dr. Kennedy, and Mr. Barrom as witnesses; (2) petitioner shall serve a subpoena duces tecum on HUB International to produce the documents upon which Mr. Barrom relied in his affidavits; or (3) the undersigned will decide the issue of lost wages on motion for a Ruling on the Record.

On June 19, 2018, after respondent filed a status report choosing option (2), petitioner filed a status report requesting 30 days to provide the updated life care plan costs and a Motion for Ruling on the Record incorporating all elements of compensation.   The undersigned granted petitioner's informal motion and ordered petitioner to file a Motion for Ruling on the Record incorporating all elements of compensation by July 18, 2018.   The undersigned denied respondent's Motion for Production as moot.

On July 17, 2018, petitioner filed an updated summary chart of all past unreimbursable medical expenses (Docs 173-2 and -3) and petitioner's updated life care plan (Doc 173-4) with an analysis of cost differences between his plan (Docs 128-2 and 173-4) and respondent's plan (Doc 136-6).   On July 18, 2018, petitioner filed his Medicaid Lien update and a press release regarding Mr. Barrom.

On July 18, 2018, petitioner filed a Motion for [a] Ruling on Damages Award ("motion").

3

On August 29, 2018, the case was referred to another special master for a mandatory settlement conference.[2]   By email contact with the undersigned's law clerk and the mediator's law clerk, the parties on two occasions have expressed a wish not to participate in mediation but to have the undersigned rule on the record.   This ruling is a response to the parties' wishes and, by separate order, the undersigned is on the day of this ruling removing this case from mediation.

On October 26, 2018, respondent filed a response to petitioner's motion ("response").

On November 2, 2018, petitioner filed a reply to respondent's response to petitioner's motion ("reply").

On November 20, 2018, petitioner filed Exhibit 91 consisting of a final Medicaid lien amount of $465.36.   On the same date, petitioner filed a status report stating that there were no outstanding items left for petitioner to file and the case was ripe for the undersigned's decision on damages.

## MOTION AND FILINGS

On July 18, 2018, petitioner filed his Motion for [a] Ruling on Damages Award. Petitioner updated his calculation of economic loss to $4,480,530.62 consisting of lost wages of $3,698,921.00, life care plan costs of $753,837.00, to-date out-of-pocket unreimbursable medical expenses of $25,599.50, and Medicaid Lien of $2,173.12, and asserted that he is entitled to the full $250,000.00 in pain & suffering.   Doc 176.

On October 26, 2018, respondent filed his response rejecting the amount of each damage component requested in petitioner's motion arguing: (1) because petitioner relies upon Mr. Barrom's affidavits in the absence of corroborating evidence needed to support his valuation of lost wages, respondent requested the undersigned award lost earnings in accordance with respondent's economist Dr. Kennedy's analysis and projections, which is $1,019,102.00 (Doc 160-2, at 1); (2) because a petitioner cannot recover damages for a non-identified autoimmune disease (referring to the Vaccine Act without a citation and citing Broekelschen v. Sec'y of HHS, 618 F.3d 1339 (Fed. Cir. 2010)) and Dr. Weiss[3] is the only expert respondent says is qualified to opine on petitioner's proper treatment in this case, petitioner's past unreimbursable medical expenses and life care plan costs should be reduced to include adrenal insufficiency, petitioner's only "defined and recognized injury"; (3) the undersigned should not compensate petitioner Medicaid Lien since he has not provided an itemized list of the services paid for by Medicaid on

---

[2] The Office of Special Masters has implemented a mandatory settlement program for certain non-autism cases filed in 2012 or beforehand.

[3] On November 13, 2016, one year and two weeks after the undersigned issued a Ruling on Entitlement in favor of petitioner, respondent filed an expert report of Dr. Roy E. Weiss, an endocrinologist, as Exhibit M.   Dr. Weiss states there is no evidence in this case that petitioner has Addison's disease.   Id. at 1.   Dr. Weiss then criticizes the costs for medications, blood tests, care givers, and transportation petitioner's life care planner included in the life care plan.

his behalf; and (4) petitioner is not entitled to the maximum award of $250,000.00 for actual pain and suffering, but respondent defers to the undersigned's discretion.   Doc 184, at 5-15.

On November 2, 2018, petitioner filed his reply to respondent's response.   Petitioner argues: (1) petitioner has produced substantial underlying documentation of his lost wages demand with three economist reports from his expert Dr. Cook and two affidavits from a fact witness Mr. Barrom who has provided answers to all of respondent's and the undersigned's questions; (2) respondent's reliance on <u>Broekelschen</u> is misplaced and the undersigned made it clear in her ruling on entitlement that petitioner does not have full-blown Addison's disease; therefore, petitioner is entitled to compensation for his past unreimbursable medical expenses and life care plan costs in full; (3) petitioner is entitled to the full $250,000.00 in pain and suffering since his suffering has already exceeded the statutory cap based on his wife's testimony; and (4) petitioner will provide the final Medicaid Lien as soon as possible.   Doc 186, at 1-6.

## DISCUSSION

### I.     Lost Wages

For calculating petitioner's lost earnings award, petitioner's expert Dr. Cook projects the following five categories of income into the future:

(a)  Petitioner's expected base salary as an employee of Argus Insurance Inc. ("Argus");
(b)  Petitioner's expected K-1 income as part owner of Argus;
(c)  Petitioner's W-2 income as the result of the transfer of retiring agent accounts;
(d)  Employer contributions to petitioner's 401(k) account; and
(e)  The sale value at retirement of petitioner's ownership interest in Argus.

Doc 159, at 3.

On the other hand, respondent's expert Dr. Kennedy believes that the only component that should be included in the calculation is petitioner's W-2 base salary and commissions ("W-2 income").   In his first expert report, Dr. Kennedy analyzed petitioner's K-1 income for illustrative purposes only.   Doc 143-1, at 5.   Because petitioner's affidavit and a 2009 K-1 were the only support at that time for petitioner's loss of annual K-1 income from January 1, 2009 to April 1, 2014 when Argus was sold to HUB International, Dr. Kennedy argued that he "cannot opine that it is more likely than not that the 2009 K-1 income would have continued at the same level in all future years."   <u>Id.</u> at 4.

On September 20, 2017 and January 24, 2018, petitioner filed Mr. Barrom's two affidavits, both of which support petitioner's K-1 income calculation.   However, Dr. Kennedy maintains in his second expert report that no supporting documentation has been produced that could be used to verify that petitioner's statements and calculations for his loss of K-1 income are accurate.   Doc 160-1, at 3.   For the same reason, Dr. Kennedy disagrees with including

5

petitioner's retiring producer W-2 income in the calculation of petitioner's past and future loss of earnings.   Id. at 5.

In addition, the parties disagree on the present value methodology.   While Dr. Cook uses a two-step discounting approach, Dr. Kennedy uses a one-step net discount rate ("NDR") approach.

Thus, the main disagreements between the parties are: (1) whether Mr. Barrom's affidavits in the absence of part or all corroborating evidence are sufficient to support petitioner's valuation of the *disputed components* of his lost earnings, which include W-2 income, ownership income,[4] and retiring producer W-2 income; and (2) the method in the calculation of the present value of petitioner's future wage loss.

### A.  W-2 Income

In his first expert report, Dr. Cook took petitioner's base W-2 income in 2009 as $42,000.00 and projected it into the future with the wage growth rates based on Board of Trustees – Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds ("OASDI").   Doc 113-2, at 11.   The sum of petitioner's W-2 income was $1,450,731.00.

In his first expert report, Dr. Kennedy used the base W-2 income in 2009 as $42,070.00 and projected it into the future with the wage growth rates based on EEIAB, which the undersigned ruled as the preferable basis in her Order of November 20, 2017.   Doc 143-1, at 3. The sum of petitioner's W-2 income was $1,017,816.

In his second expert report, Dr. Cook raised the base W-2 income starting in 2010 from $43,100.00 to $112,500.00, relying solely on Mr. Barrom's answer to Question 6 in his first affidavit, resulting in an increase in the sum of petitioner's W-2 income from $1,450,731.00 in Dr. Cook's first report to $3,086,441.00.    Doc 150-2, at 2-3.   The undersigned identified this issue in her Order of November 20, 2017:

> Question 6 in Mr. Barrom's affidavit, dated September 20, 2017, reads "Jeff's HUB/Argus Income 2014-today? Rather, from what income would Jeff's share have been calculated? If prefer to simply state what Jeff's income would have been today."   According to Mr. Barrom's Answer 6, the annual income of an insurance agent on the same track as petitioner was would be, if all production goals were met, between $100,000.00 and $125,000.00.   The undersigned finds this answer is too vague for the parties' experts to use as a base annual salary from April 1, 2014, the time of sale of Argus to HUB. While "2014-today (September 20, 2017)" is an over 3-year period of time, Mr. Barrom did not specify in his answer what was the time period he intended.   Furthermore, no information explains why the base W-2 salary

---

[4] Petitioner's loss of ownership income includes both loss of K-1 income from January 1, 2010 to April 1, 2014 and the loss on the sale of Argus ownership interest in 2014.   Doc 143-1, at 5.

> before the sale of Argus ($42,070.00) and after (between $100,000.00 and
> $125,000.00) would be so different if, as Mr. Barrom stated in his Answer 2,
> "the model of compensation for agents [at HUB] is similar to what was in
> place at Argus at the time of the sale."   Dr. Cook should not have in his
> second report increased petitioner's W-2 salary to $112,500 from 2010, over
> three years before the sale of Argus.

Doc 151, at 2.   The undersigned instructed Dr. Cook to change his calculation of annual income to reflect these corrections.   Id.

In his third expert report, Dr. Cook relied solely on Mr. Barrom's answer to Question 4 in his second affidavit to run petitioner's W-2 income from 2010 to 2017 and then based on the 2017 W-2 income projection to calculate petitioner's future wages from 2018 to 2033.   While Mr. Barrom stated in his first affidavit that "it is difficult to speculate exact incomes" and provided the estimated annual earnings range for 2017 of $100,000.00 - $125,000.00 (Doc 148-2, at 2), he provided in his second affidavit a spreadsheet showing an estimated 2010 compensation of $62,070.00 growing to an estimated $121,024.00 by 2017 without providing any database or supporting documentation (Doc 153-2, at 2-3).   Dr. Cook adopted Mr. Barrom's projections without providing any further explanation or analysis.   The undersigned finds that Mr. Barrom's projections of petitioner's W-2 income from 2010 to 2017 and Dr. Cook's adoption of Mr. Barrom's projections in his third expert report speculative and inconsistent with petitioner's historical earnings and the industry data.

In his second expert report, Dr. Kennedy states that "while the information provided by Mr. Barrom appears to support some of [p]etitioner's damages calculations, no supporting documentation has been produced that could be used to verify that his statements and calculations are accurate."   Doc 160-1, at 3.   Because petitioner is claiming a level of wages and wage growth that are materially higher than statistical earnings data for insurance agents in general and are inconsistent with petitioner's historical wage growth prior to vaccination, Dr. Kennedy argues that it is important to understand how Mr. Barrom arrived at his projections and what documentation or information upon he relied in making his projections.   Id. at 4.

In her Order of June 5, 2018, the undersigned provided petitioner with an option of serving a subpoena duces tecum on HUB International to produce the documents upon which Mr. Barrom relied in his affidavits; however, petitioner chose to file a motion for ruling on the record.   The undersigned agrees with Dr. Kennedy that it is important for a damages expert to verify the information that forms the basis of a loss calculation, especially when petitioner's claimed net losses of nearly $4 million are based on projected wages that are much higher than his prior years' earnings as well as the statistical earnings data for insurance agents as collected. The undersigned finds that the underlying material upon which Mr. Barrom based his projections is necessary for the undersigned to reach a fair and well-informed decision concerning petitioner's W-2 income.   Therefore, in the absence of petitioner's filing this material, the undersigned rules in favor of respondent on the calculation of petitioner's W-2 income.

**B.  Ownership Income**

Effective January 1, 2009, petitioner purchased a 4.99% ownership interest in Argus and executed a promissory note for the $550,310.48 purchase price payable to Argus.   Petitioner received $118,366.00 in business income via K-1 ("K-1 income" or "business income") from Argus in 2009.   On April 1, 2014, HUB International acquired Argus and all holders of promissory notes were required to pay them off with the proceeds from the sale to HUB International.   Doc 148-2, at 2.   The sale price of Argus to HUB International is confidential. Id.   In his first affidavit, Mr. Barrom provided the exact amount of gross distributions from petitioner's 4.99% ownership shares for 2010 through 2014 in the absence of any supporting documents.   Id. at 1.   In his second affidavit, Mr. Barrom stated that petitioner would have received the full approximated gross distribution for 2014 regardless of the sale of Argus in April 2014.   Doc 153-2, at 2.

In his second expert report, Dr. Cook agreed with Dr. Kennedy that the calculation for petitioner's K-1 income should not be increasing annually for the duration of petitioner's work life expectancy since January 1, 2010, but should terminate on April 1, 2014 when HUB International acquire Argus.   Doc 150-2, at 3.   In both his second and third expert reports, Dr. Cook adopted the exact amount of gross distributions that Mr. Barrom provided, resulting in $499,344.00 of petitioner's lost K-1 income before tax for 2010 through 2014.

In his first expert report, for illustrative purposes only, Dr. Kennedy analyzed petitioner's lost business income from January 1, 2010 to April 2014, using petitioner's annual K-1 income of $118,366.00 for 2009 and adjusting the annual compensation at the wage growth rates based on EEIAB.   Doc 143-1, at 5.   Petitioner's potential lost K-1 income after tax is $432,123.00. Doc 143-5, at 3.   Dr. Kennedy then projected petitioner's promissory note payments[5] as an offset to his potential damages and added petitioner's loss on sale of Argus ownership interest in 2014,[6] resulting in a total of $338,859.00 as petitioner's potential economic loss of his ownership income after tax.   In both his expert reports, Dr. Kennedy believes that a single K-1 for 2009 is not sufficient to determine petitioner's loss of business income for 2010 through April 2014.   Doc 143-1, at 5 and Doc 160-1, at 1.   Therefore, Dr. Kennedy does not include petitioner's potential economic loss of his ownership income in his calculation of petitioner's lost earnings award.

---

[5] Petitioner took out a $550,310.48 loan to acquire Argus shares, effective January 1, 2009, with monthly payments of $4,946.35 or $59,356.00 annually.   Doc 143-5, at 3.   Dr. Kennedy estimates that petitioner's payments ended upon the sale of Argus to HUB International in April 2014.   Id.

[6] Because the sale price of Argus to HUB International is confidential, Dr. Kennedy projected petitioner's loss on sale of Argus ownership interest in 2014 by applying a capitalization rate to net income as a common valuation tool.   "2009 K-1 income was $118,366.00.   Restated to 2014 dollars, annual K-1 income is $138,777.00.   K-1 Income / Capitalization Rate = Ownership Value ($138,777.00 / 24% = $578,238.00)."   Doc 143-1, at 5 n.4.   From the $578,238.00 of Argus share value, Dr. Kennedy deducted the remaining principal balance on the note payable for a net pre-tax amount of $165,143.00. Id. at 5.   In his second expert report, Dr. Cook agrees with Dr. Kennedy's methodology.   Doc 150-2, at 4.

Because petitioner owned a 4.99% ownership interest in Argus, received a distribution in 2009, and provided his 2009 K-1, the undersigned finds an award for petitioner's loss of ownership income reasonable in this case.   However, because Mr. Barrom will not provide any documentation to support his projections of petitioner's business income for 2010 through 2014, the calculation for petitioner's loss of business income should be based on petitioner's K-1 income of $118,366.00 for 2009 and the wage growth rates according to EEIAB.   In other words, the undersigned agrees with Dr. Kennedy's calculation of petitioner's potential lost ownership income.   Doc 143-5, at 1-4.   Therefore, the undersigned rules that petitioner is entitled to **$338,859.00** as his loss of ownership income.

### C. Retiring Producer W-2 Income

Unlike petitioner's K-1 income, his claimed retiring producer income was not included in petitioner's 2009 tax documents.   Petitioner claims that he was going to be compensated for retiring producer income in 2010.   Doc 131-2, at 2.   In his first affidavit, Mr. Barrom stated that "I no longer have records for such things but [petitioner] is honest and the retiring or transition plan he submitted indicated payments in 2010, so yes he would have been paid the applicable renewal commission that Argus used at that time, which would have been 25% had he met the previous year new business goal and if not it would have been 20%."   Doc 148-2, at 3.   Mr. Barrom later confirmed that had petitioner been employed at Argus in 2010, he would have received commission income for the retiring producer accounts that he had been working on in 2008 and 2009 and the retiring producer income would have been reported in his 2010 W-2. Doc 153-2, at 3.   According to Mr. Barrom's affidavits, it takes one to three years for the transitioning agent to receive income from retiring agent accounts.   However, petitioner's evidence explaining how the commission on retiring producer accounts would be paid to the retiring partner ("RP") and the transitioning partner ("TP") says otherwise:

> Beginning with policies which have an effective date of 1/1/2009 and later, RP will receive .20 points of the producer portion of the agency commission with the TP receiving the remainder of the producer portion of the commission.

Doc 113-3, at 7.   This document shows that petitioner would have received income from the retiring producer accounts in 2009.

While Mr. Barrom indicated in his first affidavit, ==Answer 9==, that he no longer has records to support additional transfers after 2010, he provided in his second affidavit exact amounts of retiring producer income petitioner would have been paid for 2010 through 2014 without any supporting evidence.   Doc 153-2, at 4.   In his third expert report, Dr. Cook adopts Mr. Barrom's projections without independently evaluating the underlying evidence and assumes that this level of income would have continued through petitioner's remaining work life expectancy. Doc 159-2, at 12-13.   As Dr. Kennedy points out in his second expert report, it is important to see how much the retiring producer accounts that were to be assigned to petitioner actually

generated in commissions and how those accounts may have changed over time.   Doc 160-1, at 5.   The undersigned agrees with Dr. Kennedy's opinion.   There was no evidence that retiring producer income was ever paid to petitioner in the manner described in the Argus policy provided in petitioner's evidence (Doc 113-3).   Since the undersigned cannot award damages based on speculation, she finds that petitioner is not entitled to the compensation for retiring producer income.

### D.  Present Value Methodology

The parties disagree on the method of calculating the present value of petitioner's future wage loss.   While Dr. Cook uses a two-step discounting approach, Dr. Kennedy uses a one-step net discount rate ("NDR") approach.   The two-step discounting approach comprises two parts: (1) future wages are grown annually at the appropriate rate for wage growth and (2) future values are discounted to present day dollars at the appropriate projected interest rate.   The NDR approach incorporates both future wage growth and future interest rates into a single, one-step calculation.   Thus, if the same assumptions are used regarding interest rates and wage inflation, the results under both approaches should be consistent.

Dr. Cook's present value approach depends on the current yields on U.S. Treasury Notes and Bonds, which are dynamic.   Doc 159-2, at 6.   Dr. Kennedy's analysis implies a 3.50 percent annual wage growth and a 4.00 percent annual discount growth, which gives him a 0.50 percent fixed annual NDR.   Doc 160-1 at 2.   Dr. Cook argues that Dr. Kennedy's reliance on a fixed NDR is inappropriate since the interest rates available to petitioner are the same rates available to all petitioners but the wage growth rate for all petitioners varies.   Doc 159-2, at 7.

However, because the wage growth and interest rates are more difficult to project as individual data series, Dr. Kennedy believes that "the net relationship between the two series is more stable and can be more reliably projected over longer periods of time."   Doc 160-1, at 1-2.   The NDR approach also includes projected wage inflation.   Id. at 2.   Dr. Kennedy provides an example in his second expert report to show that the NDR approach is more beneficial to petitioner than the two-step discounting approach, if both approaches assume that the appropriate wage inflation is 3.50 percent per year and the appropriate interest rate is 4.00 percent.   Id. at 2-3.

Thus, the disagreement between the parties is not which present value method is better academically but really what rates should be chosen in this case.   The undersigned agrees with respondent that Dr. Cook's use of current dynamic interest rates alone as the discount rate is not accurate for a projection of a future loss of earnings over a long period of years.   The undersigned finds it is reasonable for Dr. Kennedy not to rely too heavily on the recent historical or current interest rates since it would result in an understated net discount rate and it is appropriate to examine statistics over a longer period in calculating the NDR because a longer period includes the series of expansions and recessions that the economy has experienced.   Doc 143-1, at 9.   The undersigned also thinks it is important to take consumer price inflation into account over a long period of time as Dr. Kennedy does in his analysis.   Id. at 8.   Therefore, the

undersigned rules in favor of respondent on the issue of present value methodology.

## II.     Life Care Plan

On September 28, 2016, petitioner filed his original life care plan from his life care planner Ms. Lynn Trautwein.   Doc 128.   Subsequently, respondent filed a report from Dr. Roy Weiss rejecting all care items in petitioner's life care plan indicated for Addison's disease since respondent asserts through Dr. Weiss's post-entitlement ruling report that petitioner did not have Addison's disease.   Doc 136-1, at 2-3.   Respondent's life care planner Ms. Linda Curtis relied upon Dr. Weiss' report to deny a substantial part of petitioner's life care plan.   Doc 183-1.

Petitioner argues in his motion that Dr. Weiss' report was unnecessary as the undersigned and the parties were well aware of the nature of petitioner's diagnoses.   Doc 176, at 6.   In his response, respondent claims that Dr. Weiss, as a board-certified endocrinologist, is the only expert qualified to opine on the proper treatment of petitioner, and petitioner's life care plan should be based on the diagnosis of adrenal insufficiency, petitioner's only defined and recognized injury in this case.   Doc 184, at 13.

The undersigned finds respondent's argument against petitioner's entitlement to compensation for his entire immunologic reaction is contrary to law.   The undersigned made it clear in her ruling on entitlement that petitioner does not have full-blown Addison's disease, which is why petitioner's treating doctor, Dr. Richard Wilkinson, diagnosed him with adrenal insufficiency.   Simmons v. Sec'y of HHS, No. 11-216V, 2015 WL 6778563, at *8 (Fed. Cl. Spec. Mstr. Oct. 30, 2015).   Respondent's expert Dr. Levinson believed petitioner had an adverse reaction to Tdap, but he did not know the mechanism involved and labeled petitioner's adverse reaction as a hypersensitivity reaction, which the undersigned accepted in her ruling on entitlement.   Id. at *7-8.   The undersigned held that a blurring of the distinctions among the categories of adverse reaction does not preclude a finding of entitlement to damages.   Id. at *8. Therefore, the undersigned finds petitioner is entitled to compensation for his entire immunologic reaction which Tdap vaccine caused.

## III.     Past Out-of-Pocket Unreimbursable Medical Expenses

Petitioner requests to-date out-of-pocket unreimbursable medical expenses of $25,499.50. Doc 186, at 5.   Respondent maintains that the undersigned must award damages for past unreimbursable expenses consistent with the opinions of Dr. Weiss and Ms. Curtis and, thus, petitioner's request for past unreimbursable expenses should be reduced to exclude the myriad of unorthodox and medically unnecessary treatments that Dr. Wilkinson recommended.   Doc 184, at 14.    For the same reasons discussed in the section on the Life Care Plan, the undersigned disagrees with respondent and rules in favor of petitioner on the issue of out-of-pocket unreimbursable medical expenses.

## IV.     Medicaid Lien

Petitioner requests compensation for a Medicaid Lien of $2,173.12 to Rawlings Company and $252.77 to Washington State Healthcare Authority.   Doc 186, at 5-6.   Petitioner's also requests compensation for another Medicaid lien of $465.36 which Centene-Washington-Coordinated Care ("Centene-CC"), a Medicaid plan, paid.   Doc 188-2, at 1-2.

## V.      Pain and Suffering

In his motion, petitioner argues that his past pain and suffering has clearly exceeded the statutory cap in the decade since his Tdap vaccination and he continues to experience daily pain and emotional distress.   Doc 176, at 4-5.   As a result, he asserts that he is entitled to the full $250,000.00 in pain and suffering under the Vaccine Act.   Id. at 5.

Based on the evidence provided in the case, the undersigned finds an award for "pain and suffering" to be appropriate.    In determining how much to award in pain and suffering for petitioner, the undersigned notes that any amount for future pain and suffering must be adjusted to its "net present value."   Youngblood v. Sec'y of HHS, 32 F.3d 552 (Fed. Cir. 1994).   The undersigned finds it appropriate to use a NDR of 0.50 percent per year in calculating the net present value of the future award.   The award for future pain and suffering will be calculated based upon $75,000.00 divided over a 31-year period, utilizing a NDR of 0.50 percent per year.   Therefore, the undersigned awards petitioner **$100,000.00 for past pain and suffering** and **$64,255.95** as net present value of $75,000.00 **for future pain and suffering.**

## CONCLUSION

The undersigned finds that petitioner is entitled to an award of the following damages:

a.  Loss of earnings, including W-2 income based on respondent's calculation subject to the change of date as the demarcation between petitioner's past and future damages, employer contribution to petitioner's 401(k) account,[7] and $338,859.00 as his loss of ownership income;

b.  Past and future unreimbursable medical expenses for his entire immunologic reaction caused by the Tdap vaccine;

c.  Medicaid lien which is a compilation of the sums filed; and

d.  $164,255.95 for past and future pain and suffering.

Respondent shall file a proffer consistent with this Ruling no later than **January 22, 2019**.

---

[7] Both parties agree that petitioner's employer contributions to his 401(k) account is at five percent of petitioner's W-2 income.   Doc 143-1, at 4 and Doc 150-2, at 3.   The calculation should be consistent with the undersigned's ruling for W-2 income, wage growth rate, and discount rate.

**IT IS SO ORDERED.**

Dated:  December 11, 2018                                     /s/ Laura D. Millman
                                                            Laura D. Millman
                                                             Special Master